## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ROGER ERVIN,

    Plaintiff,

    v.

CORIZON HEALTH,
ASST. DIR. WILLIAM BEEMAN,
HOLLY PIERCE, RN PRACTITIONER,
MATTHEW CARPENTER, P.A.,
FRANK B. BISHOP, JR., WARDEN,
JEFF NINES, ASST. WARDEN,

    Defendants.

Civil Action No.:  ELH-19-1666

## MEMORANDUM OPINION

This civil rights litigation concerns claims of inadequate medical care and retaliation lodged by plaintiff Roger Ervin pursuant to 42 U.S.C. § 1983.  Plaintiff, who is self represented, is a prisoner at North Branch Correctional Institution ("NBCI").  He has sued Corizon Health Service; Assistant Director William Beeman; Holly Pierce, RN; Matthew Carpenter, P.A.; Warden Frank Bishop, Jr.; and Assistant Warden Jeff Nines.

In particular, Ervin claims that he has not received constitutionally adequate medical care for his glaucoma and other medical conditions.  ECF 1 at 3.  And, he alleges that he has been the subject of retaliation because of his complaints.  ECF 1.  He asserts claims, *inter alia*, under the Eighth Amendment to the Constitution; the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; violations of the Maryland Constitution; and medical malpractice.  ECF 1 at 3.[1]

---

[1] The Americans With Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008, contains five titles:  Title I, Employment; Title II, Public Services; Title III, Public Accommodations; Title IV, Telecommunications; and Title V, Miscellaneous Provisions.  Plaintiff

Several exhibits are appended to the suit.  ECF 1-1.  Ervin subsequently filed a First Amended

Complaint ("Amended Complaint") as to some of the defendants (ECF 44), adding additional

claims.  In both complaints, he seeks compensatory and punitive damages.[2]

In light of the serious nature of plaintiff's allegations, the Court required the Maryland

Division of Correction ("DOC") to respond, although the DOC is not a party to the case.  ECF 8.

The DOC responded (ECF 10) and submitted several exhibits.  *See* ECF 10-1 to ECF 10-5.  Mr.

Ervin subsequently moved for emergency injunctive relief.  ECF 12.  In a Memorandum (ECF 13)

and Order (ECF 14) of September 23, 2019, I denied that motion, with one exception:  I required

DOC to provide an appropriate eye exam for Mr. Ervin.  I said, in part, ECF 13 at 12-13:

> Given the evidence before me, it does not appear that Mr. Ervin is being
> denied care for his glaucoma.  Rather, he is simply declining the care that has
> been offered.  The right to treatment is "limited to that which may be provided
> upon a reasonable cost and time basis and the essential test is one of medical
> necessity and not simply that which may be considered merely desirable."
> *United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) (emphasis added).
> As such, he is not entitled to an injunction requiring eye surgery in 90 days.
>
> However, given that all parties agree that Mr. Ervin's eyesight is in
> jeopardy, and there has been a significant period of time that has passed since
> his last eye exam, I will grant injunctive relief to require that Mr. Ervin receive
> an appropriate eye exam to address his eye issues.  In the event Mr. Ervin refuses
> to attend such an appointment, counsel is directed to provide evidence of that
> refusal beyond the ROR forms that do not bear Mr. Ervin's signature.  Such
> evidence may include video recordings (with sound) or declarations under oath
> by more than one witness who hears and/or sees Mr. Ervin's refusal.

---

has not identified the Title that forms the basis for his claim.  But, the Court notes that Title II
prohibits public entities, including any State or local government or instrumentality of a State,
from discriminating by reason of a disability.  42 U.S.C. § 12132.

[2] In ECF 51, plaintiff's memorandum of law in opposition to defendants' dispositive
motions, Ervin seems to assert a violation of Section 504 of the Rehabilitation Act.  *Id.* at 37.
However, a plaintiff cannot amend his suit by assertions in an opposition to a motion.  *See Zachair
Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997), *aff'd*, 141 F.3d 1162 (4th Cir. 1998);
*Mylan Laboratories, Inc. v. Akzo*, 770 F. Supp. 1053, 1068 (D. Md. 1991).

Mr. Ervin's request for this court to order reinstatement of his pain medication prescriptions, a transfer to another prison, and to provide him with a wheelchair (ECF 12 at 3-4) are unsupported by the record. Mr. Ervin has been counseled repeatedly regarding pain management and has exhibited no objective signs that his back pain negatively affects his ability to walk. His reported insistence that he was told he would need to be on pain medications for the rest of his life is unsupported by any discernible facts subject to objective proof. It is not the role of this court to make independent medical judgments or to determine the proper course of care for chronic pain. *See Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017) (defining a serious medical need as one that has been acknowledged by a physician as mandating treatment).

The failure to provide Mr. Ervin with the pain medications of his choice does not warrant the injunctive relief sought given the objective evidence provided. Further, Mr. Ervin's conclusory statement that he requires a transfer to one of the prisons he suggests so that his disability may be accommodated lacks any allegation that he otherwise qualifies for such a transfer and there is no possibility for accommodation at NBCI where he is now confined.

The balance of equities do not tip in Mr. Ervin's favor where there is evidence that the only reason he has not received the surgery he requires is his own refusal to have the surgery and to attend appointments for evaluation of his eyes. Further, Mr. Ervin is not likely to succeed in his claims against the medical defendants, as it is his continuing disagreement with medical care professionals that appears to be the sole basis for his claims against them.

Plaintiff was "granted a brief amount of time to show cause why his claims against the named medical defendants should not be dismissed in light of this court's decision denying injunctive relief." *Id*. at 13. Additionally, the correctional defendants were served and directed to file a response. ECF 14.

Mr. Ervin filed a motion for order to show cause, with renewed complaints. ECF 22. Counsel for the DOC submitted a report to the Court (ECF 25), docketed October 18, 2019, advising that Mr. Ervin received the ophthalmology consultation as required by the Court's Order of September 23, 2019. That consultation took place at Johns Hopkins Hospital. ECF 25. Mr.

Ervin submitted a status report (ECF 26) and filed a motion to appoint counsel and for an injunction.  ECF 27.[3]

By Memorandum (ECF 28) and Order (ECF 29) of October 25, 2019, this Court denied Mr. Ervin's renewed requests for injunctive relief.  I said, in part, ECF 28 at 2-4:

> Mr. Ervin claims that his complaints of chronic pain are not being addressed; he has been denied medication in retaliation for filing administrative remedy procedure complaints; and the medical records filed in response to my order to show cause contain false information.  In short, Mr. Ervin wants to pursue his claims against the Medical Defendants.  Therefore, service of the Complaint is directed in the separate Order that follows.
>
> In his motion to show cause (ECF 22), Mr. Ervin asserts that defendants did not comply with my Order to show cause why injunctive relief should not be granted because it included a Declaration under oath from Dr.[Asresahegn] Getachew, who "is not on Mr. Ervin's complaint," and Corizon did not defend the claims against it.  *Id*. at 1. He asks this court to "make the Defendants comply to the Orders that include having the surgery done by an outside specialist so that I may not loss [sic] all of my sight."  *Id*. at 5.  He also seeks a transfer to another prison where his impaired eyesight can be accommodated, and removal from the Mental Health Tier where he states he is at risk of being harmed by another inmate with mental health issues.  *Id*.
>
> The court is satisfied that the response to the order to show cause complied with the requirements set forth in the Order.  Mr. Ervin is reminded that the Order to show cause was issued prior to service of the suit on any of the named defendants; therefore, a response from each named defendant was not required at that time.  Rather, the issue before the court was whether there was a basis for ordering preliminary injunctive relief.  The record before me supported the limited relief ordered; the motion to show cause shall be denied.
>
> ***
>
> With regard to Mr. Ervin's repeated requests for injunctive relief, the basis of which has already been addressed by this court, his requests are denied, without prejudice.  Mr. Ervin is reminded that this court cannot intervene on his behalf each time a disagreement arises regarding his medical care or his housing assignments.  To the extent ordered medications have not been delivered, he feels unsafe in his current housing assignment, or he is experiencing the same

---

[3] Mr. Ervin also filed an interlocutory appeal to the Fourth Circuit, challenging this Court's denial of injunctive relief.  ECF 31.  The Fourth Circuit dismissed the appeal on January 6, 2020. ECF 45; ECF 46.

pain he has described as an ongoing issue, those allegations have been raised in the complaint and will be addressed by all defendants after service has been effectuated. At this time, and in light of the evidence before me, as stated in my Memorandum of September 23, 2019 (ECF 13), the request for injunctive relief is denied.

NBCI Warden Bishop and Assistant Warden Nines (collectively, the "Correctional Defendants") have moved to dismiss the suit or for summary judgment. ECF 38. Their motion is supported by a Memorandum (ECF 38-1) (collectively, the "Correctional Motion") and exhibits in excess of 150 pages. Defendants Beeman, Carpenter, Corizon Health, and Pierce (collectively, the "Medical Defendants") have also moved to dismiss or for summary judgment (ECF 42), supported by a memorandum (ECF 42-1) (collectively, the "Medical Motion"). In addition, they submitted a lengthy exhibit (ECF 42-2), totaling 390 pages. Mr. Ervin's responses are at ECF 47, ECF 51, ECF 52, and ECF 53.

As noted, Mr. Ervin also filed an Amended Complaint. ECF 44. It pertains only to the Medical Defendants.[4] In response, the Medical Defendants filed a second motion to dismiss or for summary judgment. ECF 49. I shall refer to the Medical Defendants' second motion collectively with their first motion, unless otherwise noted. Plaintiff's response to the second motion is at ECF 56. In addition, Mr. Ervin has filed motions for default judgment (ECF 34, 36); for extension of time (ECF 48); for summary judgment (ECF 50);[5] for leave to file a reply (ECF 57); and under the Maryland Public Information Act ("MPIA"). ECF 58.

No hearing is necessary to resolve the motions. Local Rule 105.6 (D. Md. 2018). For the reasons set forth below, I shall grant the Correctional Motion and the Medical Motion; I shall deny

---

[4] In ECF 44, plaintiff also seeks to bifurcate the claims against the Medical Defendants. *Id.* at 1. In view of the disposition of the motions, that request is denied.

[5] Although ECF 50 is captioned as a motion for summary judgment, Mr. Ervin's pleading is more appropriately considered as an opposition to defense motions.

the motions for default judgment[6]; I shall deny leave to file a reply[7]; and I shall deny the MPIA

motion.[8]  But, I shall grant Mr. Ervin's motion for extension of time, nunc pro tunc.

## I.    Background

### A.    Claims against Correctional Defendants

In Mr. Ervin's original Complaint (ECF 1), he asserts that Corizon "plac[es] profit over

patient safety"; NBCI lacks adequately trained medical personnel; and Corizon is understaffed.

*Id.* at 3.  He explains that because of his ongoing vision issues, he exhausted his administrative

remedies and then he "went into court," which he states was the District Court of Maryland for

---

[6] In my Memorandum of October 25, 2019 (ECF 28), I said that the DOC's response to show cause was filed before service was effectuated on any defendant.  ECF 28 at 3.  Under Fed. R. Civ. Proc. 55(a) default may be entered "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise."  The failure to plead or defend does not automatically entitle a plaintiff to entry of default judgment, however.  *See Dow v. Jones*, 232 F. Supp. 2d 491, 494 (D. Md. 2002).  Entry of default judgment is not favored, and is reserved for cases where the adversary process has been halted by an unresponsive party.  *See United States v. Shaffer Equip. Co.*, 11 F. 3d 450, 453 (4th Cir. 1993).

Defendants have not failed to plead in response to the Complaint.  Therefore, the motions for default judgment (ECF 34; ECF 36) are denied.

[7] Plaintiff has submitted numerous filings.  In ECF 57, Mr. Ervin states that "a reply is necessary," but it is not clear to which pleading he seeks to reply, nor does he specify what information he seeks to present, beyond that which he has already presented. Given the number of submissions provided by Mr. Ervin, further reply appears unnecessary.

[8] On May 13, 2020, Mr. Ervin filed a "Motion for MPI-A" (ECF 58, ECF 58-1), in which he seeks regulations and other documents pertaining to employee training, inmate hunger strike procedures, and the duties and responsibilities of the warden.  ECF 58-1 at 2.  Included with the motion is a response Mr. Ervin received to his request made pursuant to the Maryland Public Information Act, informing him of the cost of the copies he sought and advising him that he may seek judicial review of the response provided.  ECF 58-2.  This court is not the appropriate forum to seek judicial review of a MPIA response.  Rather, judicial review of a response to such a request must be filed in the State circuit court located in the county where either the "complainant resides" or "the public record is located."  Md. Code (2019 Repl. Vol.), § 4-362(a)(3) of the General Provisions Article.  Moreover, at this juncture, Mr. Ervin cannot add an entirely new claim to his suit.

Baltimore City. *Id.* Mr. Ervin indicates that the evidence concerned an earlier health care provider, Wexford Health Sources, Inc. ECF 1 at 4.

A merits hearing was held on September 4, 2018. Mr. Ervin states that the Hon. Geoffrey Hengerer issued an order finding that Mr. Ervin is visually impaired and entitled to reasonable accommodations under the ADA. *Id.* at 4. Mr. Ervin states asserts that the State case was continued until March 6, 2019. And, when he returned to NBCI, he told "officials at NBCI" he was entitled to an ADA accommodation due to his visual impairment and, in response, he was put in lock-up. *Id.*

Mr. Ervin alleges that he then contacted an entity known as Disabilities Rights Maryland regarding the response by NBCI. *See* ECF 1-1 at 3. He was told that "they spoke with the ADA Coordinator Assistant Warden Jeff Nines, who[] said he will make reasonable accommodation once they get off [the] phone." ECF 1 at 4; ECF 1-1 at 3. According to Ervin, no changes were made. ECF 1 at 4. But, Mr. Ervin does not describe the accommodations he seeks, beyond a transfer to another prison.

On March 6, 2019, Mr. Ervin returned to State court. He claims he "had to prove it again." *Id.* Judge Kevin Wilson ordered the DOC to make reasonable accommodations for Mr. Ervin. ECF 1 at 4.

In an order of March 6, 2019 (ECF 12-1 at 9), the District Court of Maryland for Baltimore City found that Mr. Ervin is "visually impaired." The order directed the DOC to provide accommodations to Mr. Ervin for his visual impairment. *Id.* But, the order did not provide any guidance regarding the accommodations Mr. Ervin requires for his visual impairment. Rather, it

7

simply stated that Mr. Ervin is "afforded all the rights and privileges appertaining thereto to accommodate him due to his visual impairment." *Id.*[9]

When Mr. Ervin returned to NBCI after the court hearing in March 2019, and was "due to get off" segregation, he again asked "them to make reasonable accommodation." ECF 1 at 4. He claims the response he received from unnamed correctional staff was "we just did" and "you are going on lock up for refusing to go into general population." *Id.*

Mr. Ervin also states that Paul Goodman, M.D., an opthamologist with the former health care provider, Wexford Health Sources, Inc., told him that he has optic nerve damage in both eyes and he could lose his vision. ECF 1 at 4. Mr. Ervin claims he was upset, and sought a "mental health doctor," but NBCI has no mental health care "on site." *Id.* at 5. He asserts that he is on a mental health tier, however, where people are "yelling all day, throwing feces and smell of defecate and urine." *Id.* He also denies that he refuses medical care, claiming instead that he "can't walk without help both legs are swollen" and he has back pain. *Id.*

In plaintiff's "Emergency Motion For Injunction Order" (ECF 12), supported by exhibits (ECF 12-1), Mr. Ervin alleged that Warden Bishop and Assistant Warden Nines, "their successors in office, agents and employees and all other persons acting in concert and participation," have engaged in retaliatory conduct by placing him in segregated confinement "on the mental health tier," which endangers his health. *Id.* at 1, ¶ 1. He added that, as a result of this housing assignment, he has not had any exercise in a year; cannot make phone calls "because [he] can't see the buttons to use the phone;" and he has been denied personal hygiene items such as "hair grease" and lotions because they are not available through "indigent commissary." *Id.* ¶ 2.

---

[9] The State court case apparently was dismissed on May 8, 2019, due to Mr. Ervin's failure to name an expert. *See Ervin v. Wexford Health Source, Inc.,* Case No. 010100152882018 (Balt. City Dist. Ct. 2018) at http://casesearch.courts.state.md.us/casesearch/.

Mr. Ervin also stated that he has been unable "to be medically paroled because [he] need[s] a Doctor to testify at [his] Parole Hearing about [his] medical condition." *Id.* ¶ 3.  Further, he claims that he has been subjected to retaliatory conduct in the discontinuation of his pain medication (*id*); the receipt of a "bogus ticket"; and was "violently" placed in segregation for refusing general population housing after he filed an action in state court that resulted in a "Court Order for reasonable accommodation." *Id.* ¶ 3.  According to Mr. Ervin, the ticket he received caused his "security level to be unjustly raised."  *Id.*

Further, Mr. Ervin claimed that when he submits sick call slips to be seen by medical staff, the slips are not turned in to medical by the correctional officer charged with responsibility for doing so.  *Id.* ¶ 4.  He stated that defendant Nines sends officers to his cell "to check to see if [he] can see instead of [sending] medical personnel, or outside optometrist/glaucoma specialist." *Id.* ¶ 5.  Further, plaintiff claimed that none of the defendants complied with "this Court's September 4, 2018 Order to make reasonable accommodations" for him.  *Id.* ¶ 6.[10]  Instead, he has been put on segregation "in the mental health tier," which he states is "a worse situation."  *Id.*

In addition, Mr. Ervin alleged that he has not been given a job, and therefore he cannot earn diminution of confinement credits.  *Id.* ¶ 7.  Nor is he allowed to go outside.  *Id.*  He characterized such conduct as "adverse actions because [he] filed this action with this Court."  *Id.*

In support of the Correctional Motion, the Correctional Defendants provided a Declaration from John White, a Correctional Case Manager at NBCI (ECF 38-2 at 1-3), along with many NBCI records.  In White's review of the relevant records, he determined that Mr. Ervin was never assigned to a "mental health tier," nor was he ever "classified as Seriously Mentally Ill (SMI)" or assigned to a housing unit where SMI inmates are housed.  *Id.* at 2, ¶ 4.  Mr. White explains that

---

[10] This court has not issued such an order.

"[t]he C-tier in HU2 is designated as the SMI housing tier," and "[n]one of the other tiers in Housing Unit #1 or #2, where Plaintiff had been housed at NBCI during the relevant period, are designated SMI housing tiers." *Id.*

Moreover, the Correctional Defendants have submitted evidence that shows that Mr. Ervin has been housed in disciplinary segregation because he has incurred several institutional inmate rule violations for which he was found guilty at adjustment hearings and sanctioned with a total of 18 months of segregation. ECF 38-2 at 79-80 (Record of Disciplinary Sanctions); *see also id.* at 84, 97, 109, 116, 125, 138 (Notices of Inmate Rule Violation), and *id.* at 92, 100, 111, 119, 129, 143 (Adjustment Hearing records). Notably, when an inmate is penalized for a rule violation with confinement to disciplinary segregation, the assignment to segregated housing "supersedes" any existing assignment. ECF 38-2 at 1, ¶ 2. Disciplinary segregation brings with it restrictions on allowable inmate property; suspension of phone privileges, except for legal calls; and a $35 per week limit on commissary purchases. *Id.* While confined in disciplinary segregation, any inmate who wants to participate in "recreation" (defined as "any out-of-cell activity") must stand at his cell door at the beginning of the shift when it is announced. *Id.* ¶¶ 2-3. NBCI maintains a "Monthly Record of Segregation Confinement" sheet for each inmate to record daily activities, including refusal or acceptance of medication and out-of-cell activity. *Id.* ¶ 3.

Mr. Ervin's Record of Segregation Confinement for July 3 through 23, 2019, indicates that he refused his meals on six days and refused his medications on four days. ECF 38-2 at 5. For the period March 2 through March 15, 2019, he refused his medication once (*id.* at 12), and for the period November 24 through November 30, 2018, he refused his meals on four days and his medication on one day. *Id.* at 20. According to the records, fFrom October 2018 through July

10

2019, Mr. Ervin refused out-of-cell activity every day it was offered. *Id.* at 4, 6, 8, 10 13, 14, 16 18, 21, 23.

The Correctional Defendants dispute Mr. Ervin's assertion that he cannot make phone calls because he cannot see the buttons on the phone. *See* ECF 12 at 1. They provided call history records from the Inmate Telephone System, reflecting that Mr. Ervin placed a total of 445 calls between January and October of 2019. ECF 38-2 at 40-66 (ITS Call Record). Additionally, Mr. Ervin was provided with Inmate Welfare Request forms every month between January and October of 2019, each request form was approved, and the items requested were received by Mr. Ervin, as indicated by his signature at the bottom of each form. *Id.* at 67-77. However, the Correctional Defendants did not address whether the specific items Mr. Ervin notes (hair grease and lotion) are available through this form of commissary.

As to plaintiff's allegations concerning the impact on his parole eligibility, White explains that Ervin is serving a life sentence, followed by a ten-year consecutive term, and the sentence began in April 2008. ECF 38-2 at 2, ¶ 5, *see also id.* at 81. Thus, he is not yet eligible for parole because he must serve 15 years on the life sentence, plus one-half of the consecutive sentence, *i.e.*, 20 years, before he will be eligible for consideration. *Id.* Although diminution of confinement credits may apply to reduce the 20 years Mr. Ervin must serve before becoming eligible for parole, the Correctional Defendants note that he has accumulated several disciplinary infractions that have resulted in the revocation of good conduct credits. ECF 38-2 at 2, ¶ 5.

Currently, Mr. Ervin receives administrative parole reviews every five years until he meets statutory eligibility requirements for an initial parole hearing. *Id.* ¶ 6. The Correctional

Defendants do not include information regarding eligibility for medical parole.[11]  But, they point out that the Maryland Parole Commission is the agency authorized to conduct parole hearings, and neither of the named Correctional Defendants has any authority over decisions or actions taken by medical staff in connection with medical parole.  ECF 38-3 (Bishop Declaration), ¶ 6; ECF 38-4 (Nines Declaration), ¶ 6.

## B.    Claims against Medical Defendants[12]

Mr. Ervin filed an Amended Complaint against defendants Corizon, Beeman, Pierce, and Carpenter.  ECF 44.  He asserts claims of intentional infliction of emotional distress; gross negligence; medical malpractice; respondeat superior; negligent hiring and retention; and violation of his state and federal constitutional rights.  *Id.* at 7-20.

As noted in the Court's Memorandum of September 23, 2019 (ECF 13), denying emergency injunctive relief to Mr. Ervin, the treatment for plaintiff's glaucoma was complicated by his documented refusal to consent to the surgery to correct the issue that arose after a tube inserted in his left eye to relieve the pressure became exposed, leaving him susceptible to infection and vision loss.  *Id.* at 3-10; ECF 10-3 (Affidavit of Dr. Getachew); ECF 10-4 (medical records).

---

[11] Maryland Code (2017 Repl. Vol.), § 7-309 of the Correctional Services Article ("C.S.") is titled "Medical parole."  C.S. § 7-309(b) states:  "An inmate who is so chronically debilitated or incapacitated by a medical or mental health condition, disease, or syndrome as to be physically incapable of presenting a danger to society may be released on medical parole at any time during the term of that inmate's sentence, without regard to the eligibility standards specified in § 7-301" of this subtitle  A request for consideration for release on medical parole may be filed with the Parole Commission by the inmate, an attorney, a prison official, a medical professional, a family member, or any other person.  *Id.* § 7-309(c).  There is no provision in the statute requiring the physical presence of a doctor at a hearing in order to consider an inmate for medical parole.

[12] The facts set forth in this Court's Memorandum of September 23, 2019, are incorporated here by reference, and supplemented as necessary.

Mr. Ervin states that he was seen by a neurologist on June 15, 2016, for treatment of migraines, muscle spasms, and "complete lack of cartilage between back bones."  ECF 44, ¶ 11. Plaintiff also asserts that he had a cyst removed from his sinus in January 2017.  *Id*.  And, he claims that treatment was ordered by the ophthalmologist on September 28, 2017, after the failure of surgery performed on June 21, 2017.  *Id.* ¶ 12.[13]  According to plaintiff, on September 28, 2017, Paul Goodman, M.D. said that Mr. Ervin "needed to be seen by an outside glaucoma specialist." *Id*. ¶ 14.  And, Dr. Goodman reiterated that statement on October 11, 2017.  *Id.*  Mr. Ervin also states that Dr. Summerfield performed the surgery on October 4, 2019.  *Id.* ¶ 15.

Medical records submitted by the Medical Defendants in support of the Medical Motion indicate that on August 23, 2017, plaintiff was found "to have [an] exposed tube," following a medical procedure on June 20, 2017.  ECF 42-2 at 358.  On September 20, 2017, Mr. Ervin was brought to the operating room at Bon Secours Hospital in Baltimore for surgery to address the exposed tube in his left eye, but he refused the procedure.  *Id.* at 5, 358, 360, 361.  Plaintiff refused to sign the form documenting his refusal to undergo the procedure.  *Id.* at 5.

Dr. Goodman noted on September 28, 2017, that the exposed tube "presents [an] ongoing risk of endophthalmitis and needs to be repaired, however patient [is] refusing to cooperate with our plan of care."  *Id*. at 358; *see id.* at 360.  Dr. Goodman also said that plaintiff "[n]eeds to be evaluated by [an] outside glaucoma specialist."  *Id.* at 358.  A follow-up appointment occurred one week later with Dr. Goodman, who noted that Mr. Ervin had refused the surgery.  *Id*. at 4.  Dr. Goodman "explained to patient that he is at risk for infection and vision loss if he doesn't have the surgery" but Mr. Ervin "was not clear in his willingness to have surgery when asked if he would." *Id*.

---

[13] It appears that the surgery was performed on the left eye.  ECF 42-2 at 5, 361.

Mr. Ervin claims he was seen by Dr. Summerfield on October 4, 2019.  ECF 44 at 4, ¶ 15. He asserts that Dr. Summerfield told him he did not have an infection.  *Id.* ¶ 16.  Mr. Ervin relates that he told Dr. Summerfield he had an eye infection, but Dr. Summerfield said "they would be all right if they did the surgery."  *Id.* at 6, ¶ 27.  When Mr. Ervin "tried to argue the point, he was sent down to a holding cell to 'cool off'" and Dr. Summerfield then "wrote a false report claiming that there was no infection."  *Id.*

Plaintiff insists that Dr. Summerfield "falsified his report" when he said plaintiff did not have an eye infection.  *Id.* ¶ 18.  Plaintiff bases this accusation on the fact that he was sent to Johns Hopkins Hospital on October 9 and 10, 2019 (*id.* ¶ 17), where he was told he had "an extensive infection" of his eye. *Id.* ¶ 18; *see also id.* ¶ 17.  He states he was told the surgery to repair the exposed tube in his eye would need to be postponed until the infection cleared up, and also claims the surgery was scheduled to take place 30 days after October 16, 2019.  *Id.* ¶ 17.  However, plaintiff asserts that when he returned to NBCI, "they again refused to comply with doctor ordered treatments."  *Id.*  Mr. Ervin does not provide any details regarding how medical orders were refused or who refused to follow them, but concludes that the actions of medical staff at NBCI have caused him to lose his vision.  *Id.* ¶ 19.

With respect to plaintiff's status as disabled, Mr. Ervin asserts that on March 19, 2018, the Medical Defendants made false statements to the Office of the Governor that he refused treatment and "he only had glaucoma, not full disability in his eye…."  ECF 44 at 4, ¶ 20.  This prompted a response from the Governor's Office to Mr. Ervin, indicating that his eye drops had been renewed, and there was no evidence of a failure on the part of medical staff.  *Id.* ¶ 21.  Then, on April 23, 2018, "Corrections told the Governor that Mr. Ervin never mentioned" to anyone treating him that he had a "visual impairment."  *Id.* at 5, ¶ 22.

Mr. Ervin alleges that "after every admission back to NBCI from every hospital trip" he was evaluated by medical staff and they were informed of what had been prescribed for him. ECF 44 at 5, ¶ 23. He asserts that the prescribed treatments "should have saved his sight." *Id.* ¶ 24. Mr. Ervin places blame for the failure to follow up with specialists' orders on the fact that inmates at NBCI are not assigned a primary care physician to follow any medical conditions. *Id.* He adds, however, that all doctors and physician's assistants at NBCI are one team and any one of them could have provided treatment to him. *Id.* ¶ 25. He also alleges that all medical staff had a duty to keep accurate records and share important diagnostic information and lab test results. *Id.*

According to Mr. Ervin, Corizon, Beeman, Pierce, Carpenter, "and others" ignored medical orders and prescriptions by outside and in-house specialists. ECF 44 at 5, ¶ 26. He alleges that they failed to give him his eye drops while claiming he was receiving them, and unilaterally changed his prescriptions, "forcing Mr. Ervin to go on hunger strikes." *Id.* at 5-6, ¶ 26. He adds that if the Medical Defendants had done monthly pressure checks after his failed surgery, he would not have lost vision in his eye. *Id.* at 6, ¶ 27.

Although not stated clearly in the Amended Complaint, Mr. Ervin's assertions regarding prescriptions that were changed appear to concern his prescriptions for Baclofen, Neurontin, and Tramadol. He maintains these medications were prescribed to him for pain and were improperly not renewed. *See* ECF 42-2 at 209, 212-13, 217, 226, 228 (records of treatment during July 2019 hunger strike).

As noted, the Medical Defendants submitted extensive records in support of the Medical Motion. ECF 42-2.[14]

---

[14] As indicated, the medical records consist of 390 pages. Some of the records pertain to the period 2008 through December 2016, which is not relevant here. ECF 42-2 at 17-94.

Mr. Ervin was seen by Dr. Mahboob Ashraf on November 3, 2017, for sick call.  ECF 42-2 at 341.  Mr. Ervin reported having migraines and asked for Tramadol.  But, Dr. Ashraf noted that Tramadol cannot be prescribed long term and that Mr. Ervin was tapered off of Tramadol.  *Id*.  Dr. Ashraf prescribed propanalol 10mg once a day and Excedrin migraine.  *Id*.

On November 15, 2017, Dr. Ashraf prescribed a tapered dose of Neurontin for plaintiff for 30 days, which was approved by Dr. Getachew.  ECF 42-2 at 329-30.  The dose began at 600mg twice per day for seven days and tapered to 300mg twice per day for seven days.  *Id*. at 330.

Holly Pierce, CRNP, saw Mr. Ervin on November 21, 2017, for his complaint of lower back pain.  ECF 42-2 at 327.  According to the record, he reported that he had two discs removed from his back in 2016 and was told that he should remain on Ultram, Baclofen, and Neurontin indefinitely.  *Id*.  When Ms. Pierce attempted to discuss other pain management options, Mr. Ervin became angry and threatened legal action.  *Id*.

On December 7, 2017, Pierce again saw Mr. Ervin.  ECF 42-2 at 325.  He was then 56 years old.  *Id.*  Ms. Pierce reported that Mr. Ervin told her that she had a choice between prescribing Baclofen, Neurontin, and Ultram or being sued.  *Id.*

Records from November and December of 2017 also document Mr. Ervin's repeated requests for specific medications.  And, they reflect attempts by Dr. Ashraf, Dr. Getachew, and Pierce to discuss other pain management options, while advising Mr. Ervin that the requested medications are not used for long term pain management.  ECF 42-2 at 325, 327, 329-30, and 341.  Mr. Ervin was prescribed Excedrin to treat his headaches (*id*. at 341) and Celebrex to treat his back pain.  *Id.* at 327.

X-rays were obtained of plaintiff's lumbar spine.  Mr. Ervin's x-ray reports from April 10, 2018 and October 25, 2018, indicate mild degenerative changes.  ECF 42-2 at 296 and 323.

In November 2018, Mr. Ervin again went on a hunger strike in an effort to obtain prescriptions for Baclofen, Neurontin, and Tramadol.  ECF 42-2 at 262, 272, 288.  Mr. Ervin told Nurse Pierce that he had chosen not to take the Celebrex prescribed for his back pain because, in his opinion, he should not be on that medication, due to his bad sinuses.  *Id*. at 288.  Further, he told Ms. Pierce that he needed to be on Baclofen, Neurontin, and Tramadol for the rest of his life to treat his back pain, eye condition, and chronic sinusitis.  *Id*.  Ms. Pierce could find no documentation that any of those medications were prescribed for Mr. Ervin's eyes or sinuses.  *Id*.

Mr. Ervin was seen by Mary Miller, NP, on November 22, 2018.  *Id.* at 292.  She noted that Mr. Ervin was on a hunger strike, "protesting the fact that his medications were taken away." *Id*.  Ms. Miller, who is not a defendant, explained to Mr. Ervin that the medications he was seeking were not supposed to be taken for extended periods of time.  Mr. Ervin ended his hunger strike on November 27, 2018, after speaking with Ms. Pierce and telling her he was ready to eat but wanted something for his lower back pain.  *Id*. at 262.  Ms. Pierce discussed several pain management options with him and Mr. Ervin agreed to begin taking Cymbalta.  *Id*.

Mr. Ervin went on another hunger strike in July 2019.  Michael Kleptich, RN saw Mr. Ervin in the medical unit on July 4, 2019, but Mr. Ervin would not disclose why he was on a hunger strike.  ECF 42-2 at 228.  He was seen again on the same day by Kimberlie Ventura, RN, who noted Mr. Ervin had placed two notes on his cell door indicating he did not want to speak to anyone about why he was on a hunger strike.  *Id*. at 226.  While Mr. Ervin declined to have his vital signs taken, Ms. Ventura noted that Mr. Ervin did not appear to be in distress.  *Id*.

On July 6, 2019, Mr. Ervin was seen by Janette Clark, NP, who came to his cell.  ECF 42-2 at 217.  According to Ms. Clark's report, Mr. Ervin refused to leave his cell because he feared he would fall.  However, he managed to stand at the cell door at length while speaking with Ms.

Clark.  *Id*.  At that time, Mr. Ervin "share[d] multiple medical concerns" as the reason for his hunger strike.  He complained of legal blindness; he asked to be housed on the top tier in order to accommodate his blindness in his left eye; he requested pain medication for his lower back; he stated he was not taking the Cymbalta because he has glaucoma; and he claimed he was not getting his eye drops.  *Id*.

Ms. Clark saw Mr. Ervin on July 7, 2019, for evaluation due to his hunger strike; Mr. Ervin was brought to the medical unit by wheelchair.  ECF 42-2 at 209.  Ms. Clark noted that the physical exam "reveals well defined muscles of bilateral arms, shoulders, chest and back" and that Mr. Ervin said he was still working out.  *Id*.  She observed that in his statement he was still working out contradicted his claim that he could not walk and that PT was too painful for him.  *Id*. Mr. Ervin requested "to be housed ADA compliance with his blindness," and instructed her on what specifically she should and should not write in order to "protect [her] license."  *Id*.  He was agreeable to taking Mobic, and she ordered Baclofen for bedtime for 30 days.  She also wrote that Ervin "is insistent that the ophthalmologist lied to him and he will not under any circumstance allow that ophthalmologist to remove the shunt in his eye."  *Id.*

On the same date, Kleptich and Janice Robinson, RN saw Mr. Ervin in the segregation housing unit.  They noted that he was able to get off of his bed and walk to the cell door without difficulty.  ECF 42-2 at 212-13.

## II.    Standards of Review

### A.

Defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(6).  Pursuant to Rule 12(b)(6), a defendant may test the legal sufficiency of a complaint.  *Paradise Wire & Cable Defined Benefit Pension Plan v. Well*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846

F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 440 (4th Cir. 2012)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Under Rule 12(b)(6), courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (citation omitted). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly

appear[] *on the face of the complaint.*'"   *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*)

(quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts

are limited to considering the sufficiency of allegations set forth in the complaint and the

'documents attached or incorporated into the complaint.'"   *Zak v. Chelsea Therapeutics Int'l, Ltd.*,

780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448).

Ordinarily, the court "may not consider any documents that are outside of the complaint, or not

expressly incorporated therein[.]"   *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th

Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155 (2015); *see*

*Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may

consider documents beyond the complaint without converting the motion to dismiss to one for

summary judgment.  *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).

In particular, a court may properly consider documents that are "explicitly incorporated into the

complaint by reference and those attached to the complaint as exhibits."  *Goines*, 822 F.3d at 166

(citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir.

2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg*

*v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n*

*v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004);

*Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true,

the district court should consider the nature of the document and why the plaintiff attached it."

*Goines*, 822 F.3d at 167.  "When the plaintiff attaches or incorporates a document upon which his

claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id*. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id*.

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id*. at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) ) (emphasis in original) (citation omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). And, a district court may "properly take judicial notice of its own records." *Anderson v. Fed. Deposit Ins. Corp.,* 918 F.2d 1139, 1141 n.1 (4th Cir. 1990). However, under Fed. R. Evid. 201, a court may

take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

## B.

As noted, defendants have also moved, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 F. App'x 220, 222 (4th Cir. Nov. 29, 2016) (per curiam). However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[15]

---

[15] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165, 167.

In general, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co.*, 637 F.3d at 448-49; *see Putney v. Likin*, 656 F. App'x 632, 638-39 (4th Cir. July 14, 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed

---

instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC*, 672 F. App'x at 622 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).

discovery.   Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *reversed on other grounds sub nom., Gardner v. Ally Financial, Inc.*, 514 F. App'x 378 (4th Cir. 2013) (per curiam).   A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"   *Harrods*, 302 F.3d at 244 (citations omitted).   But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.   Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted).

25

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Mr. Ervin  has not filed an affidavit under Rule 56(d). Moreover, I am satisfied that it is appropriate to address defendants' motions, in part, as motions for summary judgment, because it will facilitate resolution of this case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Iraq Middle Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Variety Stores, Inc. v. Wal-Mart Stores, Inc.*,

888 F.3d 651, 659 (4th Cir. 2018); *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. Moreover, in resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018); *Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

Summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. In other words, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Thus, the trial court may not make credibility determinations on summary judgment. *Wilson v. Prince George's County*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499

F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45.   Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact.   *See Anderson*, 477 U.S. at 247-48.   If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment.   *Id.* at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).   On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law."   Anderson, 477 U.S. at 252.   And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."   *Id.*

Because Mr. Ervin is self-represented, his submissions are liberally construed.   *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).   But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'"   *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp.*, 477 U.S. at 323–24).

### III.    Legal Framework

**A.    Section 1983 Liability**

Plaintiff has filed suit pursuant to 42 U.S.C. § 1983.   Under § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.   *See,*

*e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Blessing v. Firestone*, 520 U.S. 329, 340 (1997); *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).

In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999). But, to seek redress under § 1983, it is not enough merely to allege a violation of federal law; a violation of a federal right is required. *Carey v. Throwe*, ___ F.3d ___, 2020 WL 2071060, at *7 (4th Cir. Apr. 30, 2020).

"The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245. To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips v. Pitt Co. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and

made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk Cty. v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no respondeat superior liability under § 1983. *Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular

constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

A municipality is subject to suit under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). The Supreme Court determined in *Monell* that local governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an official policy or custom of the local government resulting in a violation of the plaintiff's rights. *Id.* at 690-91. The *Monell* Court explained that, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *Id.* at 694; *see Love-Lane*, 355 F.3d at 782. But, liability attaches "only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original); *accord Connick v. Thompson*, 563 U.S. 51, 60 (2011); *Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, ___U.S. ___, 137 S. Ct. 1342 (2017).

Thus, a viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights. *See, e.g.*, *Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

However, a municipality cannot be held liable in a § 1983 action under a theory of respondeat superior. *Monell*, 436 U.S. at 693-94. Rather, "[i]t is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability at all unless the harm

was caused in the implementation of 'official municipal policy.'" *Lozman v. City of Riviera Beach*, ___ U.S. ___, 138 S. Ct. 1945, 1951 (2018) (citation omitted); *see Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984). In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted).

Of relevance here, a § 1983 claim may apply to a private entity, if that entity operates under color of state law, such as a private corporation that serves as a prison health care provider. *See, e.g.*, *West v. Atkins*, 487 U.S. at 49; *Polk Cty. v. Dodson*, 454 U.S. 312, 320 (1981); *Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355 (4th Cir. 2003); *Austin.*, 195 F.3d at 728. But, a private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. *See Clark v. Maryland Dep't of Public Safety and Correctional Services,* 316 Fed. Appx. 279, 282 (4th Cir. 2009); *Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982). To establish liability of a private corporation there must be some "official policy or custom of the corporation" that caused "the alleged deprivation of federal rights." *Austin*, 195 F.3d at 728 (citing *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2nd Cir. 1990); *Sanders v. Sears Roebuck & Co.*, 984 F.2d 972, 976 (8th Cir. 1993); *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)).

A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Locating a 'policy' ensures that

a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan Cty.*, 520 U.S. at 403-04.

In *Owens*, 767 F.3d at 402, the Fourth Circuit reiterated that to establish a *Monell* claim the plaintiff "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" (Quoting *Spell*, 824 F.2d at 1386-91) (alteration in *Owens*).  Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

A policy or custom that gives rise to § 1983 liability will not, however, "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan*, 743 F.2d at 230.  Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as a "policy or custom" actionable under § 1983.  *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997) (citing *Canton*, 489 U.S. at 389).

Notably, "not all undesirable behavior by state actors is unconstitutional." *Pink v. Lester*, 52 F.3d 73, 75 (1995) (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)).  A constitutional violation requires more than mere negligence.  *See Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). "[T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even

though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999), *cert. denied*, 529 U.S. 1067 (2000).

**B.      Eighth Amendment**

The Eighth Amendment to the Constitution protects the rights of convicted prisoners. *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) ("'[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.'") (quoting *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977)).  It prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); s*ee also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). And, "[i]t is beyond debate that a 'prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment.'" *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (citation omitted).

"Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F. 3d 539, 543 (4th Cir. 2017). The protection conferred by the Eighth Amendment imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety of . . . inmates." *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986); *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016).

In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety, including failure to protect inmates from attack, inhumane

conditions of confinement, and failure to render medical assistance. *See Farmer*, 511 U.S. at 834; *Wilson*, 501 U.S. at 303; *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017). The deliberate indifference standard is analyzed under a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97-98 (quoting *Farmer*, 511 U.S. at 834, 837-38); *see Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209 (4th Cir. 2017). The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

For a plaintiff prisoner to prevail in a suit alleging the denial of adequate medical care, the defendant's actions or inaction must amount to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106; *Lightsey*, 775 F.3d at 178; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *see Scinto*, 841 F.3d at 228.

Deliberate indifference to a serious medical need requires proof that, objectively, the plaintiff was suffering from a serious medical need and that, subjectively, the defendant was aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer*, 511 U.S. at 837; *see also Gordon*, 937 F.3d at 357; *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018); *King*, 825 F.3d at 219. As the *Heyer* Court put it, "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry." *Heyer*, 849 F.3d at 209-10. Of relevance here, "[t]he necessary showing of deliberate indifference can be

35

manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally *denying or delaying* medical care, or intentionally *interfering* with prescribed medical care." *Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018) (emphasis in *Formica*).

In the context of a claim concerning medical care, the subjective component of the standard requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40; *Scinto*, 841 F.3d at 225.  As the *Farmer* Court explained, 511 U.S. at 837, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference."  Put another way, "it is not enough that the defendant *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178 (emphasis in *Lightsey*); *see Farmer*, 511 U.S. at 839-40; *Anderson v. Kingsley*, 877 F.3d 539, 544 (4th Cir. 2017).

"Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Young v. City of Mount Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001) ("Deliberate indifference requires a

showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care.").

Generally, "[a]n actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury. Instead, it is enough that the defendant's actions exposed the plaintiff to a 'substantial *risk* of serious harm.'" *Heyer*, 849 F.3d at 210 (quoting *Farmer*, 511 U.S. at 837) (emphasis added in *Heyer*); *see Thompson*, 878 F.3d at 97-98. But, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014); *see De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013).[16]

In *Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016), the Court said: "[A] prison official's response to a known threat to inmate safety must be reasonable." And, reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)) *see also Lightsey*, 775 F.3d at 179  (physician's act of prescribing treatment raises fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk).

The Supreme Court recognized in *Farmer*, 511 U.S. at 844, that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." The

---

[16] In the context of an excessive force claim "significant injury" is not required. *Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010) (per curiam); *Danser*, 772 F.3d at 346 n.8.

Constitution requires prison officials to ensure "reasonable safety," a standard that acknowledges prison officials' "unenviable task of keeping [sometimes] dangerous [people] in safe custody under humane conditions[.]"  *Id.* at 845 (citations and quotation marks omitted).  Accordingly, "prison officials who act reasonably cannot be found liable" under the deliberate indifference standard. *Id.*; *see also Short v. Smoot*, 436 F.3d 422, 428 (4th Cir. 2006) (finding that an officer who responds reasonably to a danger facing an inmate is not liable under the deliberate indifference standard, even when further precautions could have been taken but were not); *Brown*, 240 F.3d at 390-91.

Notably, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference."  *Lightsey*, 775 F.3d at 178; *see also Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975). In *Estelle*, 429 U.S. at 106, the Supreme Court said: "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."

What the Court said in *Grayson v. Peed*, 195 F.3d at 695-96, is also pertinent: "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . ." *See also Young*, 238 F.3d at 576 (stating that a Fourteenth Amendment deliberate inference claim requires more than a showing of "mere negligence"); *Quinones*, 145 F.3d at 166 ("[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference.").

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "'that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842); *see Gordon*, 937 F.3d at 357; *Scinto*, 841 F.3d at 225. And, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk." *Brice*, 58 F.3d at 105.

However, an inmate's mere disagreement with medical providers as to the proper course of treatment does not support a claim under the deliberate indifference standard. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977). Rather, a prisoner-plaintiff must show that the medical provider failed to make a sincere and reasonable effort to care for the inmate's medical problems. *See Startz v. Cullen*, 468 F.2d 560, 561 (2d Cir. 1972); *Smith v. Mathis*, PJM-08-3302, 2012 WL 253438, at * 4 (D. Md. Jan. 26, 2012), *aff'd*, 475 F. App'x 860 (4th Cir. 2012); *Lopez v. Green*, PJM-09-1942, 2012 WL 1999868, at * 2 (D. Md. June 3, 2012); *Robinson v. W. Md. Health Sys. Corp.*, DKC-10-3223, 2011 WL 2713462, at *4 (D. Md. July 8, 2011). And, the right to medical treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977).

## IV. Discussion

### A. Corizon

Mr. Ervin's claim against Corizon is based on an allegation that the corporation employs medical staff that has been derelict in their duties to provide him with adequate medical care, including compliance with orders of outside medical specialists. *See*, *e.g.*, ECF 44, ¶ 26.  In short, Mr. Ervin has sued Corizon because it is the employer of the medical providers with whom he takes issue. *See id*. at 11-14 (counts for negligent hiring and retention and respondeat superior).  As indicated, however, the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d at 782 (no respondeat superior liability under § 1983).

Mr. Ervin asserts: "These are the kind of people the company want[s] to hire because it [is] enriched by ignoring [this] kind of conduct."  ECF 50 at 13.  He mentions in his Amended Complaint that there is a policy against assigning a primary care provider to inmates which impacts on continuity of care.  ECF 44 at 5, ¶ 24.  But, there is no evidence that an alleged policy has caused a deprivation of Mr. Ervin's constitutional rights.  To the contrary, Mr. Ervin's decisions to forego recommended treatment, against the advice of every physician he has seen, has been the primary cause for delays in his treatment.

The claim against Corizon is deficient because it is based solely on the theory of respondeat superior liability.  Accordingly, the claim against Corizon is subject to dismissal.

### B. Individual Medical Defendants

Mr. Ervin alleges that Beeman and Pierce "made it clear to the Governor['s] Office that he only has glaucoma in his left eye."  ECF 1 at 3.  In his opposition, Mr. Ervin claims that on March 19, 2018, the defendants falsely reported to the office of Maryland's Governor that he refused the surgery offered to him for his glaucoma.  ECF 50 at 7.

Even assuming the allegations are true, they fail to state a claim upon which relief may be granted.  Falsely stating to the Governor of Maryland that Mr. Ervin's glaucoma is limited to one eye, or that he refused surgery, does not expose Mr. Ervin to an unreasonable risk of harm.  The Governor is not involved in Mr. Ervin's medical care.  Therefore, the alleged misinformation could not have had any impact on the care provided to plaintiff.  Accordingly, this claim against Beeman and Pierce is not actionable.

In addition, Mr. Ervin complains that Pierce improperly cancelled his prescriptions for pain medication to treat his chronic back pain and refused to permit him to have a wheelchair as an alternative.  He states he was seen by a neurologist on June 15, 2016, "for a full body examination" and was diagnosed with migraine headaches, nerve damage, muscle spasms, and two herniated discs.  ECF 50 at 7.  Plaintiff contends that the prescribed treatment included medication.  *Id.*

According to Mr. Ervin, when he re-injured his back in a fall, Pierce had already discontinued medication prescribed to him by the neurologist he had seen years earlier.  ECF 50 at 11.  When Mr. Ervin told Ms. Pierce he had been prescribed medication to treat the pain in his back, he claims she told him it did not matter.  *Id.*  Mr. Ervin argues that the prescribed medication, which he claims he needs for the rest of his life, is a recognized medical need because a doctor ordered it.  *Id.*  He admits, however, that Ms. Pierce referred him to pain management, but claims the referral resulted in the termination of all pain medications, including those for his headaches and eye pain.  *Id.*  Mr. Ervin also admits that Ms. Pierce explained to him that he should not be on Tramadol for long term use.  *Id.* at 12.  In his view, however, Ms. Pierce has no concern for his health because she did not "do the consultation to receive [his] second surgery by [an] outside glaucoma specialist."  *Id.*

There is no objective evidence in the extensive record before me to support Mr. Ervin's claim that Pierce engaged in deliberate indifference to a serious medical need by declining to keep Mr. Ervin on specific medications for his medical ailments.   Pierce is among many medical providers who attempted to explain to Mr. Ervin that long term use of the drugs he seeks he is not medically advisable.   Further, Mr. Ervin has been prescribed multiple alternative medications for management of his pain, but he has either declined to take the medications or decided to discontinue taking the medications, for reasons unrelated to their efficacy.   Under such circumstances, Ms. Pierce's treatment of Mr. Ervin is constitutionally sufficient, entitling her to summary judgment in her favor.

Moreover, the Complaint fails to state a claim against Matthew Carpenter, P.A., as it contains no specific allegations against him.   Even in his opposition, plaintiff simply focuses on generalized claims leveled at the entire "medical team" involved in his care.   ECF 50 at 9 ("All of the doctors and physician's assistants at NBCI comprise one team of medical providers").   Without a specific allegation that Carpenter was aware of an objectively serious medical need that, if left untreated, posed a serious risk of harm to Mr. Ervin, an Eighth Amendment claim against him cannot be sustained.   *See Iko v. Shreve*, 535 F.3d at 241 (requiring actual knowledge of risk of harm to inmate and recognition that actions to address the risk were insufficient to establish § 1983 liability for constitutional violation).   Therefore, plaintiff has not stated a claim against Carpenter.

To the extent that Mr. Ervin raises Eighth Amendment claims against other parties who have not been named as defendants or served with the Complaint, the evidence does not support such a claim.   Mr. Ervin's repeated reference to other medical staff in his claims that he was not provided treatment are vague and not amenable to a cogent response.   Complaint allegations must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."

42

*Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002) (internal quotation marks omitted).  Mr.

Ervin's generalized allegations against unnamed medical staff does not satisfy this standard.

## C.    The Correctional Defendants

### 1. Exhaustion Generally

The Correctional Defendants assert that Mr. Ervin's claims have not been properly

presented through the administrative remedy procedure and therefore must be dismissed pursuant

to the Prisoner Litigation Reform Act, 42 U.S.C. § 1997e.  It provides, in pertinent part:

> (a) Applicability of administrative remedies
> No action shall be brought with respect to prison conditions under section 1983
> of this title, or any other Federal law, by a prisoner confined in any jail, prison,
> or other correctional facility until such administrative remedies as are available
> are exhausted.

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained

in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for,

violations of criminal law or the terms and conditions of parole, probation, pretrial release, or

diversionary program."  42 U.S.C. § 1997e(h).  The phrase "prison conditions" encompasses "all

inmate suits about prison life, whether they involve general circumstances or particular episodes,

and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516,

532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed. Appx. 253

(4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and

does not impose a heightened pleading requirement on the prisoner.  Rather, the failure to exhaust

administrative remedies is an affirmative defense to be pleaded and proven by defendants.  *See

Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Anderson v. XYZ Correctional Health Services, Inc*.,

407 F.2d 674, 682 (4th Cir. 2005).  Nevertheless, a claim that has not been exhausted may not be

considered by this court.  *See Bock*, 549 U.S. at 220. In other words, exhaustion is mandatory. *Ross v. Blake*, ___ U.S. ___, 136 S.Ct. 1850, 1857 (2016).  Therefore, a court ordinarily may not excuse a failure to exhaust.  *Id.* at 1856 (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

The PLRA's exhaustion requirement serves several purposes.  These include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Bock*, 549 U.S. at 219; *see Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008) (exhaustion means providing prison officials with the opportunity to respond to a complaint through proper use of administrative remedies).  It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process.  *Chase*, 286 F. Supp. at 530; *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review), *cert. denied*, 537 U.S. 949 (2002).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore*, 517 F.3d at 729; *see Langford v. Couch*, 50 F.Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he PLRA amendment made clear that exhaustion is now mandatory."). But, the court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

Notably, an inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In *Ross*, 136 S.Ct. 1850, the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." *Id*. at 1855. In particular, it rejected a "special circumstances" exception to the exhaustion requirement. *Id*. at 1856-57. But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id*. at 1855.

The Fourth Circuit addressed the meaning of "available" remedies in *Moore*, 517 F. 3d at 725, stating:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id*. at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

More recently, the Supreme Court stated in *Ross* that an administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" 136 S. Ct. at 1859 (quoting *Booth*, 532 U.S. at 738). Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit. *See Chase*, 286 F. Supp. 2d at 529-30. As a prisoner,

45

plaintiff is subject to the strict requirements of the exhaustion provisions.  *See Porter*, 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct).   Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure.  *See Booth*, 532 U.S. at 741.

Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). But, the *Ross* Court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play."  136 S. Ct. at 1859. These are when the remedy operates as a "simple dead end-with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; the administrative scheme might be so "opaque" as to become "practically speaking, incapable of use"; and prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1859-60.

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has made an "administrative remedy procedure" ("ARP") available to Maryland State prisoners for "inmate complaint resolution."  *See generally* Md. Code (2017 Repl. Vol.), Correctional Services Article ("C.S."), §§ 10-201 *et seq*.; Code of Maryland Regulations ("COMAR") 12.07.01.01B(1) (defining ARP).   The grievance procedure applies to the submission of "grievance[s] against…official[s] or employee[s] of the Division of Correction."  C.S. § 10-206(a).

Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance' to include a "complaint of any individual in the custody of the [DOC]…against any officials or employees of the [DOC]…arising from the circumstances of

custody or confinement." COMAR 12.07.01.01B(8). An inmate "must exhaust" the ARP process as a condition precedent to further review of the inmate's grievance. *See* C.S. § 10-206(b); *see also* COMAR 12.07.01.02.D; DCD 185-002 (effective August 27, 2008).

To pursue a grievance, a prisoner confined in a DOC facility may file a grievance with the Inmate Grievance Office ("IGO") against any DOC official or employee. C.S. § 10-206(b). However, if the DOC institution has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process before filing a grievance with the IGO. *See* C.S. § 10-206(b); *see also* OPS.185.0002.02.[17] And, DPSCS has established an administrative remedy procedure process that applies to DOC facilities. OPS.185.0002.02.

A grievance must be filed in writing, in a format approved by the IGO, or with an ARP form. COMAR 12.07.01.04(A). And, there are time requirements. *See* COMAR 12.07.01.05(4).

---

[17] OPS.185.0002 is an Executive Directive created by the Maryland Department of Public Safety and Correctional Services, titled "Administrative Remedy Procedure (ARP)" ("ARP Directive"). The ARP Directive was submitted as a defense exhibit in the case of *Payton v. Bishop*, ELH-15-3648, ECF 16-2. Effective August 14, 2015, the ARP Directive establishes the "policy and procedures for an Administrative Remedy Procedure (ARP) . . . to provide a method for resolving an inmate complaint related to specific conditions of confinement." *Id*. Similarly, DCD #185-003 and DCD #185-004 were submitted as exhibits in ELH-15-3645, at ECF 16-3 and 16-4, respectively. All of these exhibits are subject to judicial notice.

"[A] court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015); *see* Fed. R. Evid. 201(b)(2) (stating that a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, ___U.S. ___, 132 S. Ct. 115 (2011); *Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). In particular, pursuant to Fed. R. Evid. 201, a court may take judicial notice of an adjudicative fact if it is "not subject to reasonable dispute," in that it "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." In *Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n. 1 (4th Cir. 1990), the Court recognized that a district court may "properly take judicial notice of its own records."

The ARP process consists of multiple steps.  For the first step, a prisoner is required to file his initial ARP with his facility's "managing official."  OPS.185.0002.05C(1).  In C.S. § 1-101(k), a "managing official" is defined "as the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility."  In the DOC, each facility's warden is responsible for the administrative remedy procedure at the institutional level.  DCD # 185-003VI.  Moreover, the ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later.  COMAR 12.07.01.05A.

The second step in the ARP process occurs if the managing official denies a prisoner's initial ARP.  In that circumstance, the prisoner has 30 days to file an appeal with the DPSCS's Deputy Secretary for Operations or that official's designee.  OPS.185.0002.05C(2).  For prisoners in DOC facilities, the Commissioner of Correction is the official to whom this appeal is sent. DCD # 185-004VI.

If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO.  OPS.185.0002.05D; C.S. § 10-206(a); C.S. § 10-210; COMAR 12.07.01.05B; *see also* DCD 185-002, § VI(N)(1).  When filing with the IGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response.  COMAR 12.07.01.04(B)(9)(a).  If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing.   C.S. § 10-207(b)(1); *see* COMAR 12.07.01.07B.

An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review.  C.S. § 10-207(b)(2)(ii).  However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of

Administrative Hearings.  *See* C.S. § 10-208(2)(c); COMAR 12.07.01.07-.08.  The conduct of such hearings is governed by statute.  *See* C.S. § 10-208; COMAR 12.07.01.07D; *see also* Md. Code, Title 10 of the State Government Article.

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination.  C.S. § 10-209(b)(1)(i) & (ii); COMAR 12.07.01.10A.  However, if the ALJ concludes that the inmate's complaint is wholly or partly meritorious, the decision constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge.  *See* C.S. § 10-209(b)(2), (c).

The final agency determination is subject to judicial review in a Maryland State court.  *See* C.S. § 10-210.  But, an inmate need not seek judicial review in State court in order to satisfy the PLRA's administrative exhaustion requirement.  *See, e.g., Pozo*, 286 F.3d at 1024 ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court.").

Maryland appellate case law indicates that the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC inmate.'"  *Massey v. Galley*, 392 Md. 634, 646, 898 A.2d 951, 958 (2006) (citation omitted).  Rather, it applies only to matters that "relate to or involve a prisoner's 'conditions of confinement.'"  *Id*. at 651, 898 A.2d at 960 (citation omitted).  Thus, the grievance procedure does not apply to requests for public information under the Maryland Public Information Act, *see id*., nor does it apply to medical malpractice claims against private medical service providers who treat inmates under contract with the DOC.  *See Abramson v. Correctional Med. Servs., Inc*., 359 Md. 238, 753 A.2d 501 (2000).  Further, the administrative grievance procedure does not apply to claims for compensation for

disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," C.S. § 10-304, for which a claim to a different administrative body, the Sundry Claims Board, is the exclusive remedy. *See Dixon v. DPSCS*, 175 Md. App. 384, 927 A.2d 445 (2007).

The exhaustion requirement of the PLRA also does not apply to case management decisions, which are to be directly grieved to the IGO. OPS.185.0002.05F(1). Nor does it apply to Maryland Parole Commission procedures and decisions to withhold mail, or Prison Rape Elimination Act related claims. OPS.185.0002.05F(2),(4),(5). Those categories of complaints are addressed through separate administrative processes. *Id*.

Moreover, the ARP process does not apply to complaints relating to prisoner disciplinary procedures and decisions. OPS.185.0002.05C(3). If a prisoner is found guilty of a rule violation, the prisoner is entitled to appeal the hearing officer's guilty decision or sanction to the warden of the facility where he or she is incarcerated. COMAR 12.02.27.33(A)(1),(2). If the prisoner does not file a written appeal with the warden within fifteen days of receipt of the hearing officer's decision, the prisoner is considered to have waived the right to appeal. *Id*., COMAR 12.02.27.33(A)(3). If the warden affirms the hearing officer's guilty finding or sanction, the prisoner may then appeal to the IGO. COMAR 12.02.27.33(D); *see also* COMAR 12.07.01.05 and .06C. When filing an appeal with the IGO, the prisoner is required to include a copy of the initial notice of inmate rule violation, the hearing record, the appeal to the warden, and the warden's response to the appeal. COMAR 12.07.01.04(B)(9)(b).

On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims, such as tort claims of assault and battery against prison

officers.  *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).  And, of relevance here, the ARP process also applies to an ADA claim.  *See O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060-61 (9th Cir. 2007) (holding that the PLRA requires exhaustion of administrative remedies before an action may be brought under any federal law, including the ADA and the Rehabilitation Act); *see also Jones v. Smith*, 266 F.3d 399, 400 (6th Cir. 2001) (affirming dismissal of prisoners complaint under the ADA for failure to exhaust); *Gambino v. Hershberger*, TDC-17-1701, 2019 WL 1300856, at *10 (D. Md. Mar. 20, 2019) (recognizing that a prisoner must exhaust remedies under the PLRA before bringing an ADA or Rehabilitation Act claim); *McCoy v. Maryland Dep't of Pub. Safety & Corr. Services*, Civil Action JFM-16-0090, 2017 WL 3251558, at *6 (D. Md. July 28, 2017) (failure to exhaust ADA claim requires dismissal of claim), *aff'd*, 704 Fed. Appx. 286 (4th Cir. 2017); *Harding v. Green*, Civil Action JFM-11-1561, 2012 WL 1203956, at *2 (D. Md. April 9, 2012) (stating that a prisoner must exhaust both ADA and Rehabilitation Act claims).

An attempt to exhaust administrative remedies after a complaint is filed will not save a case from dismissal for failure to exhaust administrative remedies.  *See Neal v. Goord*, 267 F.3d 116, 121-22 (2d Cir. 2001) (overruled on other grounds).  In *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999), the court stated: "The plain language of the statute [§ 1997e(a)] makes exhaustion a precondition to filing an action in federal Court. . . . The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit."  *See Kitchen v. Ickes*, Civil Action No. DKC-14-2022, 2015 WL 4378159, at *8 (D. Md. July 14, 2015); *see also Blackburn v. S. Carolina*, No. C A 006-2011-PMD-BM, 2009 WL 632542, at *1 (D.S.C. Mar. 10, 2009) *aff'd*, 404 F. App'x 810 (4th Cir. 2010); *Kaufman v. Baynard*, CIV.A. 1:10-0071, 2012 WL 844480 (S.D.W. Va. Feb. 3, 2012) *report and recommendation adopted*, CIV.A. 1:10-0071, 2012 WL 844408

(S.D.W. Va. Mar. 12, 2012); *Miller v. McConneha, et al*, JKB-15-1349, 2015 WL 6727547, at *3-4 (D. Md. November 11, 2015).

### 2. Exhaustion by plaintiff

The Correctional Defendants provided a Declaration from Samiyah Hassan (ECF 38-5), who is employed by the IGO. Hassan avers that the IGO has never received a complaint from Mr. Ervin alleging inability to make phone calls due to his poor eyesight; denial of personal hygiene items through indigent commissary; denial of a doctor's presence at a medical parole hearing; discontinuation of medication; retaliation through issuance of false notices of infraction; or denial of access to programs and recreation. *Id.* ¶ 2. Further, Hassan states: "Since 2016, [Mr. Ervin] has appealed three ARP complaints: NBCI-2402-15, regarding not receiving a 2400 calorie a day diet; NBCI-0023-17, dated January 4, 2017, regarding being denied recreation activities, appealed to IGO on January 26, 2017; [and] NBCI-2441-17, dated October 17, 2017, regarding his Sick Call Requests being ignored, appealed January 10, 2018." *Id.* ¶ 3. There is no indication in the IGO's records that Mr. Ervin appealed an ARP concerning an alleged refusal to provide accommodations to him for a disability in compliance with the ADA. *Id.* at 3 (Screenshot of IGO complaints received from Roger Ervin between March 13, 2000 and January 10, 2018).

Mr. Ervin contends that he has exhausted administrative remedies because they were found meritorious and he did not need to appeal them any further. ECF 51 at 37. He also states, without explanation, that defendants have blocked him from using the ARP process. *Id.* Through his suit, plaintiff asserts that he is "seeking relief only in this court." *Id.* at 41. With his motion for summary judgment (ECF 50), Mr. Ervin has submitted a declaration, a memorandum, and several ARP complaints, two of which were found partially meritorious.

An ARP dated August 31, 2017 (NBCI-2096-17) concerns an alleged failure to provide Mr. Ervin with a pass to take a shower on the lower level of the housing unit.  ECF 51-2 at 1-2 The ARP was dismissed as without merit on November 21, 2017.  *Id.* at 1.

In an ARP dated January 2, 2018 (NBCI 0132-18), Mr. Ervin claimed that he did not receive his medication on December 25, 2017.  It was dismissed as without merit on April 3, 2018. ECF 51-2 at 4-5.  The response indicates that Mr. Ervin was not given any medication on December 25, 2017, because he "did not have any medication scheduled that wasn't 'keep on person.'"  *Id*. at 4.

An ARP filed May 10, 2018 (NBCI-0730-18) concerns Mr. Ervin's contention that he should be considered disabled under the ADA due to his visual impairment.  ECF 51-2 at 6-7.  The ARP was dismissed as without merit.  The response said, in part, that "[i]t is the provider's belief that your vision is sufficient to allow you to function at NBCI at this time" and the "condition does not constitute ADA intervention at this time."  *Id*. at 6.

Plaintiff filed an ARP complaint on October 8, 2018, as a resubmission (NBCI 1605-18), requesting to be placed on the "chronic care" list.  It was dismissed because an investigation revealed that his medical history and reports provided "no indication for [him] to receive chronic care at this time."  ECF 51-2 at 14.

As noted, two of the ARPs Mr. Ervin includes were found to be partially meritorious.  The first, NBCI 2441-17, was filed on November 1, 2017, and concerned Mr. Ervin's claim that he was not receiving prescribed medications for his eyes following surgery to correct his glaucoma, and he had not received nasal spray that was ordered to treat his headaches.  ECF 51-2 at 10-11. The response indicates that eye drops were ordered for plaintiff on September 28, 2017, but that "there is no record of a non-formulary being completed until 10/24/17."  *Id*. at 10.  However, by

the time the response was written, February 12, 2018, Mr. Ervin had received the eye drops.  *Id.*

Although the response indicates that Mr. Ervin never received the nasal spray ordered for him, it

states that since he was "on multiple medications for pain" he "would not have adversely been

affected."  *Id.*  The relief provided in the ARP response was to remind medical staff about "the

reordering and distribution of medications."  *Id.*

The second meritorious ARP complaint, NBCI 0631-18, was filed on March 5, 2018, and

concerned Mr. Ervin's claim that he had not received the eye drops he was prescribed and that he

was being denied the prescription because he was filing complaints.  ECF 51-2 at 12-13.  Mr. Ervin

included in this ARP his claim that his visual impairment qualified him as disabled under the ADA

because he was unable to use the phone or the library and could not participate in recreation, due

to a fear of falling or being victimized by other inmates.  *Id.* at 13.  The response addressed only

the failure to provide Mr. Ervin with eye drops, explaining that on September 28, 2017, Mr. Ervin

was prescribed eye drops for one year, but the non-formulary was not submitted until October 24,

2017.  *Id.* at 12.  The prescription was filled on December 26, 2017, and the order showed it as

expiring in February 2018, despite other records indicating it was active until September 28, 2018.

*Id.*  To correct the problem, another order had been sent and providers were to be "educated on the

importance of generating and submitting non-formularies at the time a medication is ordered."  *Id.*

The response did not address any of Mr. Ervin's other claims regarding use of the phone or the

library, participation in recreation, or an accommodation under the ADA.  *Id.*

Mr. Ervin's assertion that he had no need to appeal any of the responses on his ARPs is

belied by his own evidence.  The claims he asserts against the Correctional Defendants were never

addressed through the administrative grievance procedure, and the ARP complaints that were

found partially meritorious are not relevant to the claims asserted in his Complaint against the

Correctional Defendants. His bald assertion that he was prevented from availing himself of the full benefit of the administrative procedure is completely unsupported by any objective, factual evidence.

### 2. Retaliation

Mr. Ervin claims that he was the subject of retaliation for availing himself of the administrative process. I turn to address Mr. Ervin's retaliation claim.

Mr. Ervin's retaliation claim is most fairly construed as a claim that he suffered retaliation for the exercise of his First Amendment right to petition for the redress of grievances. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).

To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

Although "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," the "incarceration does not divest prisoners of all constitutional protections." *Shaw v. Murphy*, 532 U.S. 223, 228–29 (2001). "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Specifically, the Fourth Circuit has ruled that an inmate's

"right to file a prison grievance free from retaliation" is protected by the First Amendment. *Booker v. S. Carolina Dep't of Corrections*, 855 F.3d 533, 545 (4th Cir. 2017).

Mr. Ervin must also demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action. *See Constantine*, 411 F.3d at 501. The showing can be based on circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity and that the retaliation took place within some "temporal proximity" of that activity. *Id.* A plaintiff can establish this element of retaliatory conduct if the defendant took an action that could "'deter a person of ordinary firmness from exercising his First Amendment rights.'" *Martin v. Duffy*, 858 F.3d 239, 250 (4th Cir. 2017) (citation omitted).

It is the causal connection element that Mr. Ervin has failed to demonstrate. The evidence establishes that Mr. Ervin was not assigned to a "mental health tier," as he claimed. Indeed, when the Correctional Defendants provided this Court with information regarding the nature of his housing unit, Mr. Ervin attempted to change his claim to an allegation that a mentally ill inmate, who he does not name, was assigned as his cellmate. *See* ECF 51 at 9 (claiming a "mental health inmate" was put into plaintiff's cell "while the light was out" and Mr. Ervin was asleep).

Moreover, there is no evidence before this Court that any alleged assignment was done by either of the named Correctional Defendants, nor that there was a retaliatory animus involved in the assignment. To the contrary, there is objective evidence in the record that supports the Correctional Defendants' explanation that Mr. Ervin was assigned to his current housing unit because he was found guilty of institutional rule violations. Although plaintiff alleges that one or more of the tickets he received was "bogus," he provides no information as to why he feels the ticket was undeserved, or why he was unable to present such an argument to the hearing officer considering the evidence against him.

The notices of infraction that Mr. Ervin received on September 30, 2018, November 28, 2018, January 26, 2019, March 26, 2019, May 24, 2019, and July 22, 2019, charged him with the same rule violation under nearly identical circumstances.  *See* ECF 38-2 at 84, 97, 109, 116, 125, and 138.  In each case, Mr. Ervin was charged with violating Rule 316, which prohibits inmates from refusing a housing assignment.  *Id.*  With one exception, the notices of infraction were written by different officers.  ECF 39-2 at 97 (Mallow); 109 (Eagleson); 116 (Adams); 125 (Eagleson); and 138 (Gilpin).  Mr. Ervin did not appeal any of the decisions by the adjustment hearing officer. *Id.* at 94 (appeal waived), 103, 114, 123, 133, 147.

The first infraction was issued by Officer Shillingburg when Mr. Ervin refused to return to his cell following a shower because he claimed he had issues with his cellmate.  ECF 38-2 at 84. Mr. Ervin pled guilty at the adjustment hearing and received a 60-day segregation sentence.  *Id.* at 93.  Thereafter, each time Mr. Ervin was informed his segregation time was over and he could move to general population, he refused to be handcuffed for purposes of the move and told the reporting officer he was not going to general population.  *Id.* at 97, 109, 116, 125, and 138.  Mr. Ervin attended only one of the resulting adjustment hearings and testified he told the officer he wanted assurances of accommodation before moving, but the officer said no one understood what that was.  *Id.* at 120-1.  At all other hearings, Mr. Ervin waived his appearance.  *Id.* at 100, 111, 129, 143.

Where, as here, there is an independent, legitimate reason for the adverse actions taken against the plaintiff prisoner, the adverse actions cannot be said to be retaliatory.  *See Rizzo v. Dawson*, 778 F.2d 527, 532 and n. 4 (9th Cir. 1985) (prima facie case of retaliation requires a showing that actions challenged did not advance legitimate correctional goals).  Given Mr. Ervin's steadfast refusal to obey direct orders to move from disciplinary segregation to general population,

his continued confinement to disciplinary segregation has no "causal relationship" between Mr.

Ervin's filing of ARP complaints or this suit and his confinement to segregation.  *See Duffy*, 858

F.3d at 249 (requiring causal connection); *see also Ridpath v. Bd. Of Governors Marshall Univ.*,

447 F.3d 292, 318 (4th Cir. 2006) (demonstration of "but for" cause required).  Thus, had Mr.

Ervin exhausted administrative remedies on this claim, defendants would be entitled to summary

judgment in their favor.

### D.     State Law Claims

In the context of plaintiff's claims against the Medical Defendants, Mr. Ervin asserts claims

of violations of his State constitutional rights, medical malpractice, gross negligence, and

intentional infliction of emotional distress.  ECF 44 at 7-11; 14-16.  Under 28 U.S.C. § 1367(a), a

federal court may exercise "supplemental jurisdiction over all other claims that are so related to

claims in the action within such original jurisdiction that they form part of the same case or

controversy under Article III of the United States Constitution."

"[T]he doctrine of supplemental jurisdiction . . . 'is a doctrine of flexibility, designed to

allow courts to deal with cases involving pendent claims in a manner that most sensibly

accommodates a range of concerns and values.'"  *Jordahl v. Democratic Party of Va.*, 122 F.3d

192, 203 (4th Cir. 1997) (quoting *Shanaghan v. Cahill*, 58 F.3d 106, 106 (4th Cir. 1995)).  In *ESAB*

*Group, Inc. v. Zurich Insurance PLC*, 685 F.3d 376, 394 (4th Cir. 2012), the Fourth Circuit

described the traditional approach to supplemental jurisdiction (previously known as "pendent"

jurisdiction).  It said, *id.* at 394 (internal citation omitted):

> [S]o long as one claim in an action presented a federal question on the face of the
> well-pleaded complaint, a court could exercise jurisdiction over the entire
> constitutional case or controversy.  It does not follow, however, that the federal
> court had original jurisdiction over the entire case; rather, it had original jurisdiction
> over at least one claim, allowing the exercise of supplemental/pendent jurisdiction
> over the remaining claims.  And the Supreme Court subsequently recognized that,

when the exercise of pendent jurisdiction over these claims became "inappropriate," district courts had inherent authority to remand them to state courts.

However, pursuant to § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  In *Shanaghan v. Cahill*, 58 F.3d at 110, the Fourth Circuit recognized that under § 1367(c)(3), "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when federal claims have been extinguished."  *See also ESAB*, 685 F.3d at 394 ("Section 1367(c) recognizes courts' authority to decline to exercise supplemental jurisdiction in limited circumstances, including . . . where the court dismisses the claims over which it has original jurisdiction."); *Hinson v. Norwest Fin. S. Carolina, Inc.*, 239 F.3d 611, 616 (4th Cir. 2001) (stating that, "under the authority of 28 U.S.C. § 1367(c), authorizing a federal court to decline to exercise supplemental jurisdiction, a district court has inherent power to dismiss the case . . . provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met").  *See also*, *e.g.*, *Ramsay v. Sawyer Prop. Mgmt. of Md., LLC*, 948 F. Supp. 2d 525, 537 (D. Md. 2013); *Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda*, 390 F. Supp. 2d 479, 500 (D. Md. 2005).

The statute "is a broad grant of supplemental jurisdiction over other claims within the same case or controversy, as long as the action is one in which the district courts would have original jurisdiction."  *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 558 (2005).  "When, as here, the federal claim is dismissed early in the case, the federal courts are inclined to dismiss the state law claims without prejudice rather than retain supplemental jurisdiction."  *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-727 (1966).

Accordingly, Mr. Ervin's claims under Maryland law shall be dismissed, without prejudice. In so doing, this court makes no judgment on the merits of those claims.

### IV.     Conclusion

For the reasons stated herein, the claims against defendants Nines and Bishop are dismissed, without prejudice, due to Mr. Ervin's failure to exhaust administrative remedies; the claims against defendants Corizon and Carpenter are dismissed for failure to state a claim. Summary judgment is granted as to the claims against defendants Beeman and Pierce.  And, all State law claims are dismissed, without prejudice.

A separate Order follows.

_____May 13, 2020___                    _____/s/_____
Date                                                      Ellen L. Hollander
                                                              United States District Judge